IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MAURICE WILSON                  :       CIVIL ACTION
                                :
          v.                    :
                                :
RAMON GERBER, et al.            :       NO. 11-6517


MEMORANDUM

McLaughlin, J.                                    July 26, 2013

          This action arises from the plaintiff's employment

with American Paper Tube & Core ("APTC"), a corporation owned by

Ramon Gerber.  Maurice Wilson alleges that APTC and Gerber

retaliated against him for complaining about discriminatory

treatment to the U.S. Equal Employment Opportunity Commission

("EEOC") and Pennsylvania Human Relations Commission ("PHRC").

He brings claims under Title VII of the Civil Rights Act of 1964

("Title VII"), the Pennsylvania Human Relations Act ("PHRA"),

and 42 U.S.C. § 1981.[1]

          The defendants have moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure on Wilson's Title VII and PHRA claims.  They argue

---

[1] Wilson's second amended complaint asserted retaliation and
discrimination claims under Title VII, the PHRA, and § 1981, as
well as a claim for wrongful discharge.  4/18/12 2d Amd. Compl.
(ECF No. 22).  After Wilson withdrew his wrongful discharge
claim, this Court granted the defendants' motion to dismiss
Wilson's claims of discrimination.  The Court concluded that no
inference of discrimination could be established by the facts
alleged.  6/29/12 Order (ECF No. 31).

-1-

that Wilson failed to exhaust his administrative remedies prior to bringing those claims. The defendants have also moved for summary judgment on the merits of Wilson's § 1981 claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. After holding oral argument on June 28, 2013, the Court will grant the defendants' motion for judgment on the pleadings, but deny the motion for summary judgment.

I.   Summary Judgment Record

The facts described below are undisputed unless noted otherwise. Inferences are drawn in the light most favorable to Wilson, the non-moving party. Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

A.   American Paper Tube & Core Hires Wilson

APTC was a paper core tube manufacturer located at 2113 East Rush Street, Philadelphia. Ramon Gerber was the vice president and secretary of APTC until July 14, 2010, when he purchased the company from its former President, David Perelman. On the same date, Gerber purchased American Paper Products of Philadelphia, Inc. ("APPP") from Perelman, becoming the president and sole shareholder of both companies. APPP has a plant in Totowa, New Jersey and another plant in Framingham,

Massachusetts, and also maintains a sales office in Kulpsville, Pennsylvania. APTC and APPP are separate corporations. DX A (Def. Resp. to Pl. 1st Set of Interrogs.), no.2; DX B (2/5/13 Gerber Dep.) at 13-4, 103-4.[2]

Perelman remained an employee of APTC until the company dissolved. He is currently employed at APPP's Kulpsville office. DX D (2/15/13 Perelman Dep.) at 7-8.

Maurice Wilson, an African American, began working as a driver for APTC on October 2, 2009. Gerber told Wilson that he was being hired to replace a "company" driver, who was not a member of the Highway Truck Drivers and Helpers Local 107 Union ("the Union") and did not receive union benefits. He explained that APTC had an agreement with the Union that allowed it to retain one non-union driver. DX C (2/4/13 Wilson Dep.) at 12; PCX 3 (2/5/13 Gerber Dep.) at 55-6.

APTC is a signatory to a National Master Freight Agreement with the International Brotherhood of Teamsters. Under the terms of this agreement, APTC drivers become members of the Union on their thirty-first day of employment. PX 11 (Nat'l Master Freight Agreement).

---

[2] "DX" refers to the exhibits Gerber and APTC submitted in support of their motion. "PX" refers to exhibits submitted by Wilson in support of his opposition to the defendants' motion, and "PCX" refers to exhibits attached to Wilson's revised counter-statement of undisputed facts.

While Wilson was employed at APTC, the company hired a white driver named Mike Beaumont, who was a member of the Union and received union benefits.  DX H (APTC Position Statement) at 3, 7.

B.  Wilson Seeks Union Benefits

In March 2010, Wilson developed chest pains while driving, and stopped at a hospital in Maryland.  Gerber drove to Maryland to bring Wilson back to Philadelphia.  During the return trip, Wilson complained about his lack of union health insurance.  Gerber told Wilson he could not afford to keep the APTC plant open if Wilson joined the Union.  He offered to get Wilson a 401(k), or to try and get him into the Totowa local, which demanded a lower pension plan.  Wilson raised the issue of union benefits on several other occasions during his tenure with APTC.  DX C at 60-1, 64, 153-54.

In late September or early October 2010, Wilson contacted Michael Nugent, a Teamsters business agent.  He asked Nugent how to join the Union.  Nugent called APTC in early October and informed the plant manager, Pete Curran, of the Union's intent to make Wilson a member.  PCX 4 (Nugent Dep.) at 19-21.

On November 22, Nugent spoke to Gerber regarding Wilson's union membership.  Gerber tried to convince Nugent not

to make Wilson a member.  Gerber also told Nugent that he had
fired Wilson, adding "you are going to put me out of business."
Nugent called Wilson to check whether he had been fired, and
Wilson replied that he had not.  PX 5 (Nugent Notes).

APTC discharged Wilson the next day.  Curran sent
Wilson a letter attributing this termination a November 11, 2010
incident where Wilson drove his tractor trailer into a manhole,
and to "customer related issues."  DX L (11/23/10 Letter).  The
manhole collision cost over $10,000 in repairs to Wilson's
truck.  DX M (11/11/10 Insurance Claim Docs.).  Wilson had been
unable to see the hole because it was overgrown, and although
Gerber did warn him to be careful, he did not "come down hard"
on Wilson at the time.  DX B at 171-73; DX C at 105.  Customers
complained about Wilson in August, September, and November 2010
for refusing to help unload his truck, making a late delivery,
and refusing to help move a forklift trapped between his truck
and a loading dock.  Wilson did not receive disciplinary write-
ups for any of these incidents.  DX F (EEOC/PHRC Charge) at 5.

Nugent spoke to Perelman on November 23, and agreed to
"see what [Nugent] could work out" with Wilson's pension plan.
PX 5.  The Union also filed a Report of Grievance with APTC.  DX
P.

APTC rehired Wilson the following day.  Curran gave
Wilson a second chance letter and forwarded a copy to the Union.

The letter reiterated Curran's dissatisfaction with Wilson's customer service. It also listed two occasions on which Wilson's truck required repairs, stating that further accidents would not be tolerated. In addition to the November 11 manhole collision, Curran blamed Wilson for causing $5524.45 worth of damage to the fender of his truck on September 2, 2010. DX N (11/24/10 Rehire Letter); DX O (9/24/10 Insurance Claim Docs.). Wilson's culpability for the fender damage was "questionable," and Wilson denies causing it. DX B at 153; DX C at 129.

On December 1, Gerber and Perelman met with Nugent and Bill Hamilton, the president of the Union, to discuss Wilson's union membership. Gerber and Perelman told the Union representatives that Wilson's pension plan was "something [APTC] just can't handle." DX B at 190. Nevertheless, the defendants agreed to include Wilson in the Teamsters Local 107 bargaining unit, effective December 1, 2010. DX Q (12/1/10 Union and APTC Agreement).

On December 6, Curran gave Wilson a memo regarding Wilson's failure to report a third accident: backing his trailer into the APTC plant's gate. Curran wrote that, although he could suspend Wilson for a week under the collective bargaining agreement, Nugent's intervention had convinced him to reduce Wilson's suspension to one day. Curran added that a repeat incident would bring disciplinary action "up to and including

discharge." DX R (12/6/10 Memo). Wilson denies responsibility
for this accident. DX C at 184-88.

Gerber sent the Union a letter on December 15,
notifying them that APTC's plant would close due to the "current
economic conditions" they discussed at the December 1 meeting.
PX 8 (12/15/10 Letter).

Wilson submitted a formal application to the Union on
December 17. DX S (Wilson Union App.). On the same day, Gerber
announced that APTC was closing. PCX 3 (2/5/13 Gerber Dep.) at
96.


C.   Wilson's EEOC and PHRC Complaint

Wilson dual-filed a charge of discrimination ("Charge"
or "EEOC/PHRC Complaint") with the EEOC and PHRC on December 23,
2010. On the Charge, Wilson checked off "Race," "Color," and
"Retaliation" as causes of discrimination. He listed November
23, 2010 as the date that discrimination took place, and
indicated that it was continuing. DX F.

In the Charge's statement of particulars, Wilson
alleged discrimination because Beaumont, already a member of the
Union, received a union pay-grade and benefits while Wilson did
not. The statement recounted Wilson's hiring, requests for
union membership and benefits, temporary discharge and rehire,
conversations with Beaumont about the Union, and discovery of

the wage disparity between union and non-union drivers.  It named Pete Curran several times.  It also averred that after December 1, Gerber "started telling everyone in the plant that he has to shut down the plant because he cannot afford two union drivers", and that Gerber had announced APTC was closing "because of [Wilson] and Teamster Local 107" on December 17.  In addition, the Charge claimed that when Gerber picked Wilson up from the hospital in Maryland, he did not drive Wilson all the way home.  DX F at 4-6.

The defendants received a Notice of Charge of Discrimination from the EEOC on January 6, 2011, with the boxes for race, color, and retaliation checked.  This notice included a copy of the Charge.  It was incorrectly addressed to "David Perelman, President, American Paper Products of Philadelphia", but mailed to APTC's business address.  DX A, no. 3; DX E (12/24/10 Not. of Charge); DX G (1/4/11 Not. of Charge).

On February 16, 2011, the EEOC sent a Request for Information to Gerber.  Under the heading "Harassment/Retaliation," this document asked whether Wilson or any other APTC employee had complained about the conduct Wilson's Charge described.  APTC responded by filing a Position Statement with the EEOC.  DX I (2/16/11 EEOC Request); DX H (APTC Position Statement).

The EEOC issued Wilson a Dismissal and Notice of Rights on July 21, 2011, stating that its investigation was "unable to conclude that the information obtained establishes violations of the statutes." The PHRC sent Wilson a right to sue letter on February 1, 2012. DX J (7/21/11 EEOC Not. of Rights); DX K (2/1/12 PHRC Not. of Rights).

### D. Gerber's Allegedly Retaliatory Conduct

APPP took over the leases for both of APTC's tractor trailers in January 2011. DX B at 130, 192-193. On January 28, Gerber and Wilson drove to APPP's Totowa plant to drop off Wilson's truck. Gerber then drove Wilson back to APTC. DX C at 276; DX U (Wilson's Driver Log for 1/28/11).

During the drive back to Philadelphia, Wilson asked Gerber whether he could work at APPP's Totowa, New Jersey plant. Gerber responded to the effect that Wilson was not invited. After they arrived back at APTC, Wilson again told Gerber that he wanted to work for APPP in Totowa. Gerber responded, "Maurice, I don't believe you filed charges against me. . . . [Y]ou made a complaint that I didn't take you all the way home and now you want to go work with me up in Totowa." Gerber may have also mentioned the Union during this exchange. Wilson spoke to Gerber regarding employment in Totowa for a third time on or around February 16. Once again, Gerber told him that he

was not invited to work there.  Wilson did not know that APTC and APPP were separate entities.  He thought Gerber controlled hiring at APTC and APPP.  DX C at 205, 212, 277-78, 283-85, 301.

Wilson drove for APTC several times after January 28, 2011, even though his old truck was no longer at its plant.  DX Z (Wilson's Driver Log for 2/11).  He turned in his keys on February 18, and Gerber gave him a letter stating that he was permanently laid off.  Wilson requested this letter in order to receive unemployment benefits immediately.  DX C at 234-37, 252; DX BB (2/18/2011 Layoff Letter).

On or around February 23, 2011, APTC called Wilson in to drive again, and gave him a set of truck keys.  He took these keys home with him after work.  Gerber called Wilson that night and asked him to return the keys, but Wilson did not bring them back until February 28.  The delay upset David Perelman, because APTC needed a truck to clear out its plant.  Perelman got into an argument with Wilson when he arrived to make the return. Both men cursed at each other, and they continued to argue until Gerber intervened.  Gerber and Wilson did not discuss working in Totowa during this encounter.  DX C at 252-56, 259, 290; DX D at 70-1.

During a February 2011 conversation with Wilson, Gerber discussed Wilson's EEOC/PHRC Complaint in the presence of others while holding the Charge.  Gerber asked Wilson why his

Charge did not state that Wilson was hired as a non-union driver. Eileen Kupniewski, Gerber's administrative assistant, was in the room, as was David Perelman. DX C at 259-61, 270, 274. Curran may also have been present. DX B at 121-22.[3]

The parties dispute the date and extent of this conversation. Wilson says that the conversation took place on February 28, after Gerber interjected himself into Wilson's argument with Perelman, whereas Gerber places the incident earlier in February. Gerber recalls discussing Wilson's hire and asking Wilson why he went to the Union, but Wilson says that Gerber asked him about the Charge's allegations of racial discrimination. Compare Id. at 120-26, 150, with DX C at 259-61, 270, 274.

Following his termination, Wilson received unemployment benefits until August 25, 2012. He also sought work with other companies. One company's recruiter told Wilson not to apply because he had an accident and insurance claim listed from his time at APTC. DX C at 18, 309, 311-12.

---

[3] Gerber showed the EEOC/PHRC Complaint to Perelman, Kupniewski, and Curran on occasions separate from this incident. DX B at 118-20. Kupniewski recalls learning about Wilson's Charge when she "jumped in" to a discussion between Gerber and Perelman after overhearing the allegation that Gerber discriminated against Wilson. PCX 5 (Kupniewski Dep.) at 16-17, 19.

The one employment reference that Gerber gave Wilson was "positive" because Gerber always felt Wilson was a "good driver." When the prospective employer asked him whether Wilson had suffered any reportable accidents, Gerber told her about the November 11, 2010 manhole incident and the associated $10,000 repair cost. DX B at 168.

### E.    APPP's Rehiring of APTC Employees

APTC's plant was sold in March 2011. DX B at 14. APTC had 17 employees as of February 18, 2011, all of whom were laid off when the plant closed. DX A at 2-3. Wilson was not aware of APPP's Totowa plant hiring any former APTC employees. DX C at 218-19.

As President of APPP, Gerber left final hiring decisions up to his plant managers. DX B at 33. Howard Goldberg was the General Manger of the Totowa plant. DX V (Def.'s Initial Disclosures) at 3. Goldberg was not interested in hiring any workers from APTC. Gerber convinced him to take on two skilled operators, James Robinson and Gerry Sherlock, who knew how to use heavy machinery that APTC transferred to Totowa. Sherlock quit soon afterwards. The Totowa plant also temporarily hired Pete Curran to help with customer relations during the transition. DX B at 104-6, 108, 114-16.

APPP's Totowa plant had its own trucks and drivers, but it took over and kept one of APTC's tractor trailers. Goldberg hired a driver for this truck around the time that APTC was shutting down. DX B at 107-8, 192-93; DX D at 68-9.

## II.  Analysis[4]

Wilson brings retaliation claims under Title VII, the PHRA, and § 1981 against both APTC and Gerber.

---

[4] Motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are decided according to the same standard as Rule 12(b)(6) motions to dismiss. Revell v. Port. Auth. of N.Y. & N.J., 598 F.3d 128, 134 (3d Cir. 2010).  To survive a motion for judgment on the pleadings, the complaint must include sufficient well-pled factual allegations, accepted as true, to set forth a facially plausible claim for relief. Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012).  When deciding such a motion, a court may consider not only the pleadings, but also attached exhibits, matters of public record, and documents integral to or explicitly relied upon in the complaint.  See Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007).

Granting summary judgment is appropriate where there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must demonstrate the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant advances a properly supported motion for summary judgment, the burden of production shifts to the non-moving party, who must set forth specific facts showing that a triable issue exists.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249-50 (1986).  Courts must consider the evidence in the light most favorable to the non-movant.  Am. Eagle Outfitters, 584 F.3d at 581.

To bring a Title VII claim, an employee must first exhaust his administrative remedies by presenting his claim to the EEOC in a timely charge of discrimination. 42 U.S.C. § 2000e-5. Similarly, an employee must file a timely charge with the PHRC before bringing a PHRA claim. 43 Pa. Stat. § 959 (h), § 962 (c). Pennsylvania plaintiffs may dual-file a charge with both agencies. See Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997). Because the purpose of requiring exhaustion is to afford the EEOC and PHRC an opportunity to resolve disputes outside of court, plaintiffs cannot bring claims based on matters about which the agencies were not notified. Anjelino v. New York Times Co., 200 F.3d 73, 93 (3d Cir. 1999) (citation omitted). Section 1981 does not require administrative exhaustion.

On the merits, Wilson's retaliation claims are all analyzed under the same burden-shifting framework. See Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 & n.14 (3d Cir. 2010); Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006). First, the employee must make out a prima facie case by showing that (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between the protected activity and the adverse employment action. Oliva, 604 F.3d at 798. If the employee establishes a prima facie case, the employer must

offer a legitimate, non-retaliatory reason for its conduct.  Id.
If the employer does so, the employee must show that this reason
is a pretext for retaliation.  Id.

Wilson alleges that the defendants retaliated against
him for filing his EEOC/PHRC Complaint when (1) Gerber gave
Wilson a letter that described his layoff from APTC as
"permanent" on February 18, 2011; (2) Gerber told Wilson he was
not invited to apply for work at APPP's Totowa plant during two
January 28, 2011 conversations, and during another conversation
on or around February 16, 2011; and (3) Gerber read aloud from
Wilson's Charge in the presence of others in February.

There is no dispute that Wilson cannot bring his Title
VII claim against Gerber as an individual defendant.  For the
reasons below, the Court finds that Wilson failed to exhaust his
Title VII claim against APTC, as well as his PHRA claim against
APTC and Gerber.  The Court also finds that a genuine issue of
material fact exists as to whether Gerber's actions constitute
unlawful retaliation under § 1981.  The Court will grant the
defendants motion for judgment on the pleadings on Wilson's
Title VII and PHRA claims, but deny the motion for summary
judgment on Wilson's § 1981 claim.

A.   Title VII and PHRA Claims

        Courts apply an identical exhaustion analysis to Title
VII and PHRA claims.  See Mandel v. M & Q Packaging Corp., 706
F.3d 157, 163 (3d. Cir 2013).  A claim under either statute is
exhausted if it is based on acts that fall "fairly within the
scope of the prior [agency] complaint or the investigation
arising therefrom."  Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.
1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir.
1984)).

        This test looks to the similarity of the grievances
alleged in the judicial complaint and in the agency complaint.
In Waiters, the court held that the plaintiff's Title VII claim
for retaliatory discharge was within the scope of an EEOC charge
that alleged different instances of Title VII retaliation,
because the claim and the charge's "core grievance-retaliation-
[was] the same."  729 F.2d at 238.  Conversely, in Antol, the
court held that a claim for sex discrimination was outside the
scope of a prior charge whose core grievance was disability
discrimination.  82 F.3d at 1296; see also Atkinson, 460 F.3d at
453 (holding that a Title VII retaliation claim was not within
the scope of a charge alleging Title IX retaliation).

        In his judicial complaint, the core grievance of
Wilson's Title VII and PHRA claims is retaliation, whereas the

core grievance of his EEOC/PHRC Complaint is discrimination.
Wilson checked the box for "retaliation" on his Charge, but in
the attached factual statement, he set forth allegations
relating only to discrimination.  The Charge described how
Wilson was treated differently than a white driver by being
denied union benefits.  It did not include the incidents on
which his retaliation claims are based, and none of the other
events it recounted could constitute retaliation under Title VII
or the PHRA.  See Ans. Attach. A (EEOC/PHRC Complaint).

        The first element of a retaliation claim is the
employee's participation in protected activity.  Oliva, 604 F.3d
at 798.  Wilson's Charge does not describe any protected
activity.  It does mention that Wilson complained about his lack
of union benefits and membership, but Title VII and the PHRA do
not protect general complaints of unfair treatment.  To qualify
as protected activity, informal protests must identify a
specific discriminatory action and the characteristic that
motivated it.  Curray-Cramer v. Ursuline Acad. of Wilmington,
Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006).  Wilson's Charge
does not allege that he ever before accused Gerber of denying
him union membership because of his race.  See Ans. Attach. A.

        Because the acts underlying Wilson's Title VII claim
against APTC and his PHRA claim against APTC and Gerber were not

fairly within the scope of his EEOC/PHRC Complaint, the Court finds that Wilson failed to exhaust these claims.

B.    Section 1981 Claim

As stated above, to establish a prima facie case of retaliation under § 1981, an employee must show that his employer took an adverse employment action against him that was causally connected to the employee's participation in protected activity.  Oliva, 604 F.3d at 798.  To constitute an adverse employment action, an employer's conduct must be likely to dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Here, it is undisputed that Wilson participated in protected activity when he filed his EEOC/PHRC Complaint. Wilson argues that the defendants took adverse employment actions against him when Gerber read aloud from his EEOC/PHRC Complaint, wrote him a letter stating that he was permanently laid off, and told him that he was not invited to apply for a job at APPP.  The Court considers each of these incidents in turn.

### 1.  February 18, 2011 Layoff Letter

Wilson did not suffer an adverse employment action when Gerber issued him a letter stating that his layoff from APTC was permanent.  Wilson asked for this letter so that he could avoid unemployment arbitration by clarifying that he had been laid off, not fired for cause.  As to the characterization of Wilson's layoff as "permanent," the unemployment office needed to know whether he would be called back into work.  When Wilson presented Gerber's letter, he was approved for unemployment immediately.  DX C at 234-37.  A reasonable worker would not be deterred from pursuing a charge of discrimination by a letter issued at his request and for his benefit.

### 2.  Conversations About Working in Totowa

With respect to Gerber's statements that Wilson was not invited to APPP's Totowa plant, the plaintiff makes out a prima facie case of retaliation.  Because Wilson did not know that APPP was a separate entity from APTC, he would have understood Gerber's statements as a denial of transfer.  A denial of transfer is an adverse employment action.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).[5]

---

[5] At oral argument, plaintiff's counsel suggested that the defendants also retaliated against Wilson when APPP hired a new driver for the truck it took over from APTC, rather than hiring

During the second January 28 conversation about Totowa, Gerber
told Wilson "I don't believe you filed charges against me
. . . . and now you want to go work with me up in Totowa." DX C
at 277. From this remark, a jury could infer a causal
connection between the denial of transfer and Wilson's protected
activity. DX C at 205, 212, 277.

Because Wilson advances a prima facie case, the burden
shifts to his employer to provide a legitimate, non-retaliatory
explanation for its adverse employment action. Oliva, 604 F.3d
at 798. The defendants assert that Gerber told Wilson he was
not welcome in Totowa because Wilson had a record of customer
complaints and truck accidents.

Wilson bears the final burden of demonstrating that
the defendants' explanation is a pretext for retaliation. Id.
To survive summary judgment at this stage, an employee must
adduce evidence from which a reasonable jury could find the
employer's proffered explanation unbelievable, or conclude that
retaliation was more likely than not a determinative cause of
the adverse employment action. See Anderson v. Wachovia
Mortgage Corp., 621 F.3d 261, 271 (3d Cir. 2010).

Wilson has adduced evidence from which a reasonable
jury could find it unbelievable that Gerber did not want Wilson

Wilson. See 6/28/13 OA Trans. at 41-42. This hire is not
attributable to the defendants. It was made by APPP's plant
manager, not by Gerber or an APTC employee. DX D at 68-69.

in Totowa because of his work record.  In his deposition, Gerber downplayed the seriousness of Wilson's September and November 2010 accidents.  He noted that neither involved moving violations on the open road, and that Wilson's culpability for the September accident was questionable.  Gerber also testified that Wilson was a "good driver" and that he gave Wilson a "positive reference" with a prospective employer.  DX B at 153, 168, 172-173, 176-177.

Although Wilson can demonstrate that his disciplinary record is a pretextual motive for Gerber's statements about Totowa, the record discloses another non-retaliatory explanation for this adverse action.  Gerber was frustrated with Wilson over joining the Union.  Gerber told Wilson in March 2010 that he could not afford to keep APTC open if Wilson became a member.  DX C at 153-54.  During the meeting in which APTC agreed to recognize Wilson's membership, Gerber informed the Union that APTC would be unable to "handle" Wilson's pension.  DX B at 190.  He notified the Union that APTC was closing two weeks after Wilson's membership went into effect.  PX 8; DX Q.  This evidence suggests that the denial of trasnfer was the latest in a pattern of anti-union acts.

Despite this evidence of a non-retaliatory motive for Gerber's conduct, the Court cannot award summary judgment for the defendants.  Gerber expressly referenced Wilson's protected

activity as a reason Wilson was not welcome in Totowa.  DX C at

277.  Based on this reference, a reasonable jury could find that

retaliation was a determinative cause of the adverse action.


### 3.   Reading from Wilson's EEOC/PHRC Complaint

A reasonable jury could also find that reading from

Wilson's EEOC/PHRC Complaint in February 2011 constituted an

adverse employment action.  Wilson and Gerber dispute whether

this conversation occurred while Wilson was still an APTC

employee.  Compare DX B at 121, with DX C at 270.  Furthermore,

the summary judgment record could be read to indicate that this

conversation was confrontational.  Being chastised by the

company president in front of coworkers might deter a reasonable

worker from pursuing a charge of discrimination.  In addition,

reading from Wilson's Charge is quite plainly causally connected

to the protected activity of filing the Charge.

Evidence that Gerber resented Wilson's contact with

the Union provides a non-retaliatory explanation for the

reading.  Gerber asked Wilson about the allegations relating to

his hire as a non-union driver.  DX C at 260.  Nonetheless, it

would not be unreasonable for a jury to find that retaliation

was Gerber's motive for reading the Charge, because the Charge

was the product of Wilson's protected activity.  Triable issues

of fact remain as to whether the February reading was an adverse

employment action, and, if so, whether it was determinatively caused by retaliation.

### 4.   The Scope of APTC's Liability

Finally, the Court notes that serious questions exist regarding Wilson's ability to recover from APTC.  APTC cannot be held liable for APPP's ultimate decision not to hire Wilson. Based on this record, APTC and APPP are separate entities.  DX A, no. 2.[6]

However, the Court understands the plaintiff's theory to be that APTC is liable for dissuading Wilson from applying to APPP, not for APPP's failure to hire Wilson.  The relevant conduct was perpetrated by Gerber.  Therefore, Wilson can recover from APTC to the extent that he proves Gerber acted as an agent of APTC, rather than an agent of APPP.  Because Gerber was personally involved in the alleged acts of retaliation, he can be held liable under § 1981, regardless of whether APTC is also liable.  See Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001).

An appropriate order will issue separately.

---

[6] APPP is not a defendant in this case.